UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GENZYME CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>THOMAS DOTTER and NOVARTIS PHARMACEUTICALS CORPORATION,<br><br>Defendants. | CIVIL ACTION No. 18-cv-11940-RGS |

## VERIFIED AMENDED COMPLAINT

### Parties

1. Plaintiff Genzyme Corporation ("Genzyme") is a Massachusetts corporation with its principal place of business in Cambridge, Massachusetts.

2. Defendant Thomas Dotter ("Dotter") is an individual domiciled in the state of Texas.

3. On information and belief, defendant Novartis Pharmaceuticals Corporation ("Novartis") is a Delaware corporation with its principal place of business in East Hanover, New Jersey.

### Jurisdiction and Venue

4. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) inasmuch as (1) the suit is between citizens of different states; and (2) the amount in controversy exceeds the amount or value of $75,000, exclusive of interest and costs. Specifically, Genzyme is a citizen of Massachusetts, Dotter is a citizen of Texas and, on information and belief, Novartis is a citizen of Delaware and New Jersey.

1

5.      This Court has personal jurisdiction over Dotter by his consent.  In section 10(e) of the agreement he entered into with Genzyme in connection with his hiring (the "Employment Agreement"), Dotter agreed "that I shall be subject to the jurisdiction of the courts of the Commonwealth of Massachusetts in any action brought by Genzyme in connection with any of the provisions of this Agreement."

6.      This Court also has specific personal jurisdiction over Dotter because he has sufficient contacts with the District of Massachusetts.  This action arises out of Dotter's transacting of business in the District of Massachusetts, specifically his entering into the Employment Agreement with Genzyme, a Massachusetts-based company.  In connection with his performance of the Employment Agreement, Dotter made regular trips to Genzyme's Massachusetts offices for meetings, trainings and interviewing and interacted with Genzyme's personnel in Massachusetts.  This action relates directly to Dotter's contacts with Massachusetts in that it arises out of Dotter's breach of the Employment Agreement.

7.      Dotter further consented to personal jurisdiction by removing this case to the District of Massachusetts.

8.      This Court has specific personal jurisdiction over Novartis because it transacts substantial business in Massachusetts and, as set forth below, it intentionally interfered with the business operations and trade secrets of a Massachusetts company.  Additionally, it did so with full knowledge that the Employment Agreement contained a Massachusetts forum selection clause and consent to personal jurisdiction in Massachusetts.  By its actions interfering with the Employment Agreement and aiding and abetting Dotter's misappropriation of Genzyme's trade secrets, Novartis caused Genzyme injury in Massachusetts.

9.      Venue is proper in the District of Massachusetts pursuant to 28 U.S.C. § 1391.

10. Venue in this Court is consistent with the Employment Agreement, where the parties agreed that "venue shall lie in Massachusetts."

## Facts

11. Genzyme is a global biotechnology company engaged in the research, development, manufacture, sale, and marketing of products and services to address unmet medical needs, including those associated with rare diseases, multiple sclerosis, immunology and oncology.

12. In 2012, Genzyme began to expand its sales organization for the expected launch of new treatments within its multiple sclerosis business (the "MS Business").

13. In connection with its expansion of its sales organization in the MS Business, Genzyme hired Dotter as a regional business director ("RBD") for the MS Business.

14. As an RBD, Dotter was responsible for managing a team of approximately 10 salespeople who covered one region of Genzyme's MS Business. Dotter's region included the states of Texas and Louisiana.

15. On or about May 8, 2012, in connection with his employment by Genzyme, Dotter signed the Employment Agreement, a true and accurate copy of which is attached hereto as Exhibit A.

16. In section 1(a) of the Employment Agreement, Dotter promised that, "[w]hile employed at Genzyme and thereafter, I shall not, directly or indirectly, use or disclose to anyone outside of Genzyme any Confidential Information other than pursuant to my employment by and for the benefit of Genzyme."

17. In section 7(a) of the Employment Agreement, Dotter represented, "I specifically acknowledge and agree that while I am employed by Genzyme and for a period of one (1) year

after termination of such employment (for any reason, whether voluntary or involuntary) I will not directly or indirectly in any position or capacity engage in the following activities for myself or for any other person, business, corporation, partnership or other entity . . . (ii) request, solicit, induce, hire (or attempt or assist in doing any of these actions) any employee or other persons (including consultants) who may have performed work or services for Genzyme within one (1) year prior to the termination of my employment with Genzyme to perform work or services for any person or entity other than Genzyme; or (iii) become employed by, associated with or render services to any Competing Organization in connection with any Competing Product, in the United States or in any other country where Genzyme does business or is planning to do business."

18. The Employment Agreement defines "Competing Organization" as "persons, organizations, or any other entity, including myself, engaged in, or about to become engaged in, research or development, production, distribution, marketing, providing or selling of a Competing Product."

19. The Employment Agreement defines "Competing Product" as "products, processes, or services of any person, organization or entity other than Genzyme, in existence or under development, which are substantially similar, may be substituted for, or applied to substantially similar end use of the products, processes or services with which I worked on in any capacity, including a sales or marketing capacity, at any time during my employment with Genzyme or about which I acquired Confidential Information through my work with Genzyme."

20. In section 7(a)(iii) of the Employment Agreement, Dotter agreed "that this covenant not to compete is reasonable in that I can continue my chosen profession when I leave the employment of Genzyme so long as I do not work for companies that are Competing

Organizations in connection with Competing Products and so long as I do not disclose confidential, proprietary and trade secret information of Genzyme." Section 7(a)(iii) of the Employment Agreement further states, and Dotter acknowledged, that this provision "does not impose an unnecessary restraint because of the nature of the confidential, proprietary and trade secret information of Genzyme related to the Competing Products which mandates protection in the geographical areas described above." In the same section, Dotter also agreed "that the covenant is necessary to protect the goodwill and confidential, proprietary and trade secret information of Genzyme."

21. Dotter served as an RBD in Genzyme's MS Business for approximately six years. During that time, Dotter was provided with confidential and proprietary information about Genzyme's MS Business. This information, conveyed in writing and at meetings Dotter attended, included information about the MS Business' performance, strategies and goals and, its strategies with respect to its competitors, including for competing against Novartis. Specifically, this included Genzyme's marketing and sales data (as encompassed in part in Regional Business Reviews prepared by Dotter), its plans for modifying its marketing strategies with respect to its MS drugs, and its perceived strengths and weaknesses as compared to its competitors.

22. Genzyme provided this confidential and proprietary information to Dotter in reliance on Dotter's covenants in the Employment Agreement. In addition to entering into the Employment Agreement with Dotter and similar agreements with other employees who have access to its confidential information, Genzyme takes other steps to protect its trade secrets, including by password protecting and encrypting its internal hard drives, cloud drives and employee computers, labeling documents containing trade secrets as proprietary and

confidential, limiting access to proprietary and confidential information, and providing training to employees on protecting the company's confidential information.

23. On or about July 2, 2018, Dotter notified Genzyme of his intention to resign from Genzyme effective July 13, 2018.

24. Dotter did not inform Genzyme of his plans for post-Genzyme employment.

25. When asked about his post-Genzyme employment, Dotter told a co-worker, "Unfortunately, I am not divulging where I am going. I simply want to depart in good standing and not create any friction with Sr. Leadership."

26. After departing Genzyme, Dotter's LinkedIn profile continued to list his current position as "Region Business Director at Genzyme" with the dates "June 2012 – Present."

27. Dotter became employed by Novartis and worked within Novartis' multiple sclerosis business as Director, Strategic Account Manager, West Coast. His territory included the entire western half of the United States, including Texas.

28. On information and belief, Dotter hid his new employment at Novartis to prevent Genzyme from learning of his breach of the Employment Agreement.

29. Novartis is one of approximately seven companies in the United States with an FDA-approved treatment for multiple sclerosis. Novartis is recognized within the industry and within Genzyme as one of the largest competitors to Genzyme's MS Business.

30. On information and belief, Dotter's role at Novartis was to manage Novartis' strategic account managers ("SAMs") within the west coast region of Novartis' multiple sclerosis business. That geographic area overlapped at least in part with the area for which Dotter was responsible at Genzyme.

31.     On information and belief, SAMs serve a similar role to Thought Leader Liaisons ("TLLs") at Genzyme. TLLs serve as conduits between the manufacturer of a treatment (e.g., Genzyme or Novartis) and the physicians, or key opinion leaders, who prescribe those treatments. While TLLs are not salespeople, they call on many of the same physicians salespeople call on, support sales efforts and the company's business objectives by responding to the needs and requests of physicians who prescribe Genzyme's treatments, and are heavily involved in developing and implementing the company's marketing strategies.

32.     While employed at Genzyme, Dotter worked very closely with Genzyme's TLLs in the MS Business in his region, and also worked with TLLs outside of his region.

33.     Dotter's role managing SAMs at Novartis (a Competing Organization) for its multiple sclerosis treatments (a Competing Product), particularly within some of the same territory as he was assigned at Genzyme, violated the terms of his covenant not to compete and raises significant concerns about the protection of Genzyme's confidential, proprietary and trade secret information.

34.     Dotter has provided Genzyme's Confidential Information to Novartis.

35.     On one occasion, during Dotter's interview process with Novartis, he provided Novartis with a Genzyme Regional Business Review presentation, which contains Genzyme's sales data by prescriber, and an account review, which includes Genzyme's perceived strengths, weaknesses and competitive challenges with respect to specific doctors and a specific Strengths, Weaknesses, Opportunities, Threats ("SWOT") Analysis.

36.     On another occasion, Dotter provided a Los Angeles SAM at Novartis with a Genzyme Regional Business Review presentation.

37. With respect to the documents described in paragraph 35, they were provided to Novartis at Novartis' request.

38. The above-described documents contain Genzyme's Confidential Information.

39. On information and belief, Novartis and Dotter have not destroyed or returned these documents.

40. Additionally, just weeks before resigning from Genzyme, Dotter sent an email to his personal Gmail account from his Genzyme email account that attached a screen shot of an internal Genzyme communication. The internal communication was labeled in bold "Internal Communication. Not for Distribution." The internal communication concerned Genzyme's response to Novartis' announcement of FDA approval of a therapy for multiple sclerosis.

41. On information and belief, Novartis is in the midst of an MS hiring expansion, and hired Dotter as part of that expansion as a means of gaining an unfair advantage over Genzyme. Since hiring Dotter, Novartis has worked with Dotter to gain information about Genzyme's employees in the MS Business for use in hiring these employees.

42. In particular, Dotter has provided feedback regarding candidates employed at Genzyme and participated in hiring decisions regarding Genzyme candidates. For example, on one occasion Dotter described a candidate from Genzyme as a "Lemtrada [one of Genzyme's MS drugs] superstar in that region," after Novartis asked for feedback regarding the candidate.

43. Novartis was aware of and reviewed the Employment Agreement, including Dotter's covenants not to compete, not to solicit Genzyme employees and not to disclose Genzyme's Confidential Information, prior to offering employment to Dotter. Notwithstanding its knowledge of the Employment Agreement, Novartis encouraged Dotter to leave Genzyme and join Novartis in violation of the Employment Agreement.

## COUNT I – BREACH OF CONTRACT – NON-COMPETE
### (Against Dotter)

44.     Genzyme repeats and re-alleges the allegations contained in paragraphs 1-43 above.

45.     The Employment Agreement is a binding and enforceable agreement between Genzyme and Dotter.

46.     The covenant not to compete within the Employment Agreement is reasonable in time and scope and serves the legitimate business purpose of protecting Genzyme's confidential information and goodwill.

47.     Dotter has breached the Employment Agreement by becoming employed by Novartis in its multiple sclerosis business within 12 months of the termination of his employment from Genzyme.

48.     Genzyme has been harmed by Dotter's breach of contract.

## COUNT II – BREACH OF CONTRACT – DISCLOSURE OF CONFIDENTIAL INFORMATION
### (Against Dotter)

49.     Genzyme repeats and re-alleges the allegations contained in paragraphs 1-48 above.

50.     The Employment Agreement is a binding and enforceable agreement between Genzyme and Dotter.

51.     Dotter has breached the Employment Agreement by disclosing and using Genzyme's Confidential Information.

52.     Genzyme has been harmed by Dotter's breach of contract and will continue to be harmed as long as Novartis has access to Genzyme's Confidential Information.

## COUNT III – BREACH OF CONTRACT – NON-SOLICITATION
### (Against Dotter)

53. Genzyme repeats and re-alleges the allegations contained in paragraphs 1-52 above.

54. The Employment Agreement is a binding and enforceable agreement between Genzyme and Dotter.

55. Dotter has breached the Employment Agreement by participating in the hiring Genzyme employees by a direct competitor, Novartis.

56. Genzyme has been harmed by Dotter's breach of contract and will continue to be harmed as long as Dotter continues to participate in the hiring of Genzyme employees by Novartis.

## COUNT IV – COMMON LAW MISAPPROPRIATION OF TRADE SECRETS
### (Against Dotter)

57. Genzyme repeats and re-alleges the allegations contained in paragraphs 1-56 above.

58. Genzyme possesses numerous valuable trade secrets including but not limited to strategic marketing plans for increasing its sales and market share; proprietary models regarding sales and marketing goals and projections; the Company's proprietary "Compass" database, which contains sales and marketing data and analysis regarding physicians who prescribe Genzyme's MS drugs; strategic analyses, including SWOT analyses, regarding Genzyme's competitors; and other sensitive corporate strategy information such as sales data, prescriber data, financial plans and budgets.

59. Through his employment at Genzyme, Dotter had access to these trade secrets.

60. Genzyme takes reasonable steps to preserve the secrecy of its trade secrets by entering into employment agreements containing non-disclosure provisions, password protecting and encrypting its internal hard drives, cloud drives and employee computers, labeling documents containing trade secrets as proprietary and confidential, limiting access to proprietary and confidential information, and providing training to employees on protecting the company's confidential information.

61. Dotter has disclosed Genzyme's trade secrets to Novartis and used those trade secrets at Novartis, which is a direct competitor of Genzyme, in breach of his Employment Agreement.

62. As a result of Dotter's actions, Genzyme has been, and continues to be, harmed.

### COUNT V – MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF M.G.L. C. 93, § 42
**(Against Dotter)**

63. Genzyme repeats and re-alleges the allegations contained in paragraphs 1-62 above.

64. Genzyme possesses numerous valuable trade secrets including but not limited to strategic marketing plans for increasing its sales and market share; proprietary models regarding sales and marketing goals and projections; the Company's proprietary "Compass" database, which contains sales and marketing data and analysis regarding physicians who prescribe Genzyme's MS drugs; strategic analyses, including SWOT analyses, regarding Genzyme's competitors; and other sensitive corporate strategy information such as sales data, prescriber data, financial plans and budgets.

65. Through his employment at Genzyme, Dotter had access to these trade secrets.

66. Dotter gained access to these trade secrets in confidence and was under a contractual duty not to use or disclose them without Genzyme's consent.

67. Dotter has disclosed Genzyme's trade secrets to Novartis and used those trade secrets at Novartis, which is a direct competitor of Genzyme, in breach of his Employment Agreement.

68. On information and belief, Dotter acted willfully and maliciously.

69. As a result of Dotter's actions, Genzyme has been, and continues to be, harmed.

### COUNT VI – TORTIOUS INTFERENCE WITH CONTRACTUAL RELATIONS
**(Against Novartis)**

70. Genzyme repeats and re-alleges the allegations contained in paragraphs 1-69 above.

71. The Employment Agreement is a binding and enforceable agreement between Genzyme and Dotter.

72. Notwithstanding Novartis' knowledge of the Employment Agreement, it proceeded with its plans to hire Dotter and caused him to breach the Employment Agreement.

73. Novartis did so by improperly hiring Dotter in violation of the Employment Agreement, working with Dotter to hire Genzyme employees in violation of the Employment Agreement and working with him to obtain and use Genzyme's Confidential Information, including without limitation, requesting that he send to Novartis Genzyme's Confidential Information for purposes of capitalizing on Genzyme's Confidential Information.

74. Genzyme has been harmed by Novartis' interference and will continue to be harmed as long as Novartis continues engaging in this conduct.

## COUNT VII – AIDING AND ABETTING MISAPPROPRIATION OF TRADE SECRETS
### (Against Novartis)

75. Genzyme repeats and re-alleges the allegations contained in paragraphs 1-74 above.

76. Genzyme possesses numerous valuable trade secrets including but not limited to strategic marketing plans for increasing its sales and market share; proprietary models regarding sales and marketing goals and projections; the Company's proprietary "Compass" database, which contains sales and marketing data and analysis regarding physicians who prescribe Genzyme's MS drugs; strategic analyses, including SWOT analyses, regarding Genzyme's competitors; and other sensitive corporate strategy information such as sales data, prescriber data, financial plans and budgets.

77. Through his employment at Genzyme, Dotter had access to these trade secrets.

78. Genzyme takes reasonable steps to preserve the secrecy of its trade secrets by entering into employment agreements containing non-disclosure provisions, password protecting and encrypting its internal hard drives, cloud drives and employee computers, labeling documents containing trade secrets as proprietary and confidential, limiting access to proprietary and confidential information, and providing training to employees on protecting the company's confidential information.

79. Dotter has disclosed Genzyme's trade secrets to Novartis, which is a direct competitor of Genzyme, and, on information and belief, Novartis is using those trade secrets, in breach of the Employment Agreement.

80. Novartis knew of both Dotter's obligation not to disclose Genzyme's Confidential Information and that Dotter breached that promise by transmitting Genzyme's trade secrets to Novartis.

81. Novartis actively participated in and encouraged Dotter's misappropriation of Genzyme's trade secrets by requesting that Dotter send it documents containing those trade secrets.

82. As a result of Novartis' actions, Genzyme has suffered damages.

### COUNT VIII – UNFAIR AND DECEPTIVE TRADE PRACTICES
### (M.G.L. C. 93A, §§ 2, 11)
### (Against Novartis)

83. Genzyme repeats and re-alleges the allegations contained in paragraphs 1-82 above.

84. At all relevant times, Genzyme and Novartis were engaged in trade or commerce.

85. By its actions set forth above, including aiding in the misappropriation of Genzyme's trade secrets and using Dotter's insider knowledge to solicit Genzyme employees, Novartis has engaged in conduct that constitutes unfair and deceptive acts and in practices in violation of M.G.L. c. 93A, § 11.

86. Novartis' unfair and deceptive conduct occurred primarily and substantially in Massachusetts.

87. As a direct and proximate result of Novartis' unfair and deceptive conduct, Genzyme has and will continue to suffer damages.

### REQUEST FOR RELIEF

Wherefore, Plaintiff Genzyme Corporation respectfully requests that this Court grant the following relief:

A. Enter judgment for Plaintiff against Defendants on all counts of this Complaint;

B. Award Plaintiff damages, including treble damages, in an amount to be determined at trial;

C. Issue preliminary and permanent injunctive relief to restrain and enjoin Dotter from (1) working within Novartis' multiple sclerosis business for a period of one year from the date of the order; (2) participating in the hiring of Genzyme employees for a period of one year from the date of the order and (3) disclosing and using Genzyme's Confidential Information and require that Dotter return any of Genzyme's Confidential Information within his possession, custody or control;

D. Issue preliminary and permanent injunctive relief to (1) restrain and enjoin Novartis from employing Dotter within its multiple sclerosis business; (2) prohibit Novartis from hiring any Genzyme employees for which Dotter participated in any way or provided information regarding in the hiring process; and (3) restrain and enjoin Novartis from further obtaining Genzyme's Confidential Information and require Novartis to destroy or return any of Genzyme's Confidential Information within its possession, custody or control;

E. Award Plaintiff attorneys' fees, costs and expenses in this action; and

F. Grant any such other relief that the Court deems just and proper.

## JURY DEMAND

Plaintiff Genzyme demands a trial by jury on all claims so triable.

Respectfully Submitted,

GENZYME CORPORATION,

By its attorneys,

*/s/ Michael J. Licker*
James W. Bucking, BBO #558800
Michael J. Licker, BBO #678746
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA  02210
Tel:  617-832-1000
Fax:  617-832-7000
jwb@foleyhoag.com
mlicker@foleyhoag.com

Dated:  October 22, 2018

## Certificate of Service

    I, Michael J. Licker, counsel for the Plaintiff, do hereby certify that a true and accurate copy of the foregoing document, which was filed via the Court's ECF system on October 22, 2018, will be sent electronically by the ECF system to the registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non-registered participants.

/s/ *Michael J. Licker*
Michael J. Licker

## VERIFICATION

I hereby certify that I have reading the foregoing Verified Complaint; that the factual allegations made therein are true based on my own personal knowledge, except those stated to be made on information and belief, and as to those I believe them to be true; and that no material facts have been omitted; and that the exhibits submitted are true and correct copies.

Signed under the pains and penalties of perjury this 19th day of October, 2018.

_____
Nick Reinhart
Head of Sales, U.S. MS Franchise
Sanofi Genzyme